STATE of Tennessee, Appellee,

v.

Jimmy Franklin FREEMAN, Appellant.

Court of Criminal Appeals of Tennessee, at Jackson.

Nov. 17, 1983.

A.C. Wharton, Jr., Shelby Co. Public Defender, James H. Bostick, John Dice, Asst. Public Defenders, Memphis, for appellant.

William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, Edgar A. Peterson, Asst. Dist. Atty. Gen., Memphis, for appellee.

## OPINION

TATUM, Judge.

The defendant, Jimmy Franklin Freeman, was convicted of third degree burglary with punishment fixed at not less than 3 years nor more than 6 years confinement in the State penitentiary. He was also found to be an habitual criminal which enhanced the punishment for burglary to life imprisonment. After considering the issues, we conclude that they are without merit and we affirm the judgment below.

In his first issue, the defendant states that the evidence is insufficient to support the conviction for third degree burglary. The State's evidence, which was accredited by the jury, revealed that on the evening of November 7, 1980, Mr. Walter Wright, owner of B.J. & W. Supermarket, closed the store at approximately 8:00 P.M. Before closing, he locked the doors and set the silent burglar alarm. The alarm alerts the police station and also telephones Mr. Wright's home. Early on the morning of November 8, Mr. Wright was notified by the alarm system that an intruder was in his store. He immediately went to the store and found two police officers on the outside. On command of the policemen, the defendant came out of the store.

Mr. Wright observed that glass was broken on the front door, the lock was cut off the door and the screen was standing open. Upon entering the store, Mr. Wright discovered that the wire had been cut on his alarm system. He found that his office was in disarray and cigarettes had been placed in a box which was sitting close to his office. A tape recorder had been removed from a file cabinet.

Policeman James Leroy Campbell testified that he and his partners received a radio alarm at 4:55 A.M., advising them of the burglary. The officers arrived at the store in less than one minute after receiving the dispatch. They could see a black man inside of the store. They directed the man to come out, telling him that there was a dog car on the way. After some hesitation, the defendant came out of the store and was arrested.

The defendant testified that he and his brother spent part of the night of November 7 in a nightclub drinking and taking "acid." After Avant Collins came to the nightclub, they went to the defendant's apartment. Later, the defendant and Avant left the apartment to go to a convenience store. As they were passing B.J. & W. Supermarket, the defendant got sick, sat down and had dry heaves. He thought that he heard three shots, looked around, and saw that Avant was gone. He then observed that the supermarket door was open and found Avant inside the supermarket. The defendant testified that he went in the supermarket to prevent Avant from stealing any merchandise and knocked a box from Avant's hand. Before the police arrived, he told Avant that the police were there so as to prevent Avant from stealing anything. Avant then left the supermarket out the back door and the police arrived and found only the defendant inside.

The jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate inferences which may be drawn from the evidence. *State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn.1978). The evidence above summarized is sufficient upon which a rational trier of fact could be convinced beyond a reasonable doubt of the defendant's guilt. We therefore overrule this issue. Rule 13(e), T.R.A.P.; *State v. Lequire,* 634 S.W.2d 608, 613 (Tenn.Cr.App. 1981).

In the next issue, the defendant complains that the trial court refused to allow a defense witness to testify that a third

party had confessed guilt of the burglary to the witness. The record indicates that Jerry Hix would have testified that on the morning of the burglary, Avant Collins came to Hix's home and told Hix that he had just left "a burglary" and left the defendant at the scene.

■ If the substance of Collins's alleged statement to Hix is against Collins's penal interest, then the evidence is still not admissible. In *Smith v. State*, 587 S.W.2d 659 (Tenn.1979), our Supreme Court held "that hearsay declarations against penal interest made by an unavailable declarant, to be admissible, must be proven trustworthy by independent corroborative evidence that bespeaks reliability." The evidence must be in the form of evidence from other witnesses that Collins confessed to them or extrinsic evidence connecting Collins with the burglary. There was no independent corroborative evidence of the reliability of the hearsay evidence. In order for this hearsay evidence to be admissible, the burden was on the defendant to show that the evidence, though hearsay, was trustworthy.

■ In the *Smith* case, it was also held that declarations against penal interest are not admissible unless it is shown that the declarant is "unavailable," as that term is defined in *Breeden v. Independent Fire Insurance Company*, 530 S.W.2d 769 (Tenn.1975). In the latter case, it was held that a declarant is unavailable when he is dead; beyond the jurisdiction of the court and the reach of its process; is suffering from such infirmities of body or mind as to preclude his appearance as a witness, either by personal presence or by deposition; or where he is present in court and refuses to testify on the ground of self incrimination. None of these conditions are shown to exist. We therefore hold that for these two reasons, the trial court properly excluded this evidence.

■ In the next issue, the defendant claims that the court committed error in restricting his cross examination of a State witness. The factual basis for this complaint is the fact that the jury could not agree at the first trial on the habitual criminal count of the indictment. The trial court declared a mistrial and at the second trial on the habitual criminal count, the court refused to permit defense counsel to ask a Deputy Court Clerk whether the jury at the first trial was "hung." The deputy clerk had testified as to the defendant's six prior convictions and also of the conviction of the triggering offense, third degree burglary. The defendant insists that the testimony of the deputy clerk concerning these offenses "opened the door" for cross examination concerning the hung jury. We disagree. The evidence relating to the previous convictions was relevant on the issue of whether the defendant was an habitual criminal. Evidence that another jury had before it the same charges and was unable to reach a verdict was irrelevant on the habitual criminal issue.

In his fourth and fifth issues, the defendant contends: (1) the trial court erred in ordering a mistrial at the first habitual criminal proceeding when the jury was unable to reach a verdict; and, (2) his subsequent retrial on habitual criminalty amounted to a violation of the constitutional prohibition against double jeopardy.

The defendant insists that the jury reported that it was hopelessly deadlocked on the habitual criminal count after only two hours deliberation and that there was no manifest necessity for a mistrial. The defendant reasons that since there was no manifest necessity for a mistrial, his constitutional protection against double jeopardy prevented the second trial under the habitual criminal count.

The record indicates that the jury retired for its deliberation on the habitual criminal count at 11:24 A.M. Deliberations were suspended at 12:30 P.M. for lunch and were resumed at 1:30 P.M. At 2:30 P.M., the jury indicated they wished to report to the court. At 3:20 P.M., the jury reported through its foreman that it was unable to reach a verdict and that further deliberations would be futile. The court then proceeded to poll each juror individually and

all of them stated that further deliberations would be useless. The court then declared a mistrial and ordered a retrial at a future date. The transcript reflects that the defendant made no objection to the court declaring a mistrial; the order declaring a mistrial recites that the defendant consented.

A jury may be discharged and a mistrial declared if there is a manifest necessity requiring such action by the trial judge. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn.Cr.App.1977). The impossibility of a jury reaching a verdict has long been recognized as a sufficient reason for declaring a mistrial. *Jones v. State*, 218 Tenn. 378, 388, 403 S.W.2d 750 (1966); *Arnold v. State, supra.* Where a mistrial is declared because of manifest necessity, it is not double jeopardy to retry the defendant, even though he objected to the mistrial. *Donaldson v. Rose*, 525 S.W.2d 853, 855 (Tenn.Cr.App.1975); *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). The granting of a mistrial is within the discretion of the trial court, and a reviewing court will not disturb that action absent a finding of abuse of that discretion. *State v. Compton*, 642 S.W.2d 745, 746 (Tenn.Cr.App.1982).

We hold that the trial judge did not abuse his discretion in declaring a retrial. As noted above, deliberations began at 11:24 A.M. and the mistrial was not declared until 3:20 P.M. The jury actually deliberated for approximately three hours on the issue and each juror told the trial judge that further deliberation would not produce a verdict. The record supports the trial judge's finding that "manifest necessity" existed for a mistrial. Since "manifest necessity" warranted the discharge of the jury and the ordering of a mistrial, the prohibition against double jeopardy was not violated by the second trial. These two issues are overruled.

In another issue, the defendant contends that the trial court erred in failing to instruct the jury on the offense of criminal trespass (T.C.A. § 39-3-1201), as a lesser included offense of third degree burglary. To authorize an instruction that criminal trespass is a lesser included offense of burglary, a burglary indictment must contain the phrase "breach of the peace" to describe the force used by the defendant. *State v. Smith*, 627 S.W.2d 356, 358 (Tenn. 1982); *Howard v. State*, 578 S.W.2d 83, 85 (Tenn.1979). The indictment in the case at bar does not charge that a "breach of the peace" was committed. Therefore, the trial judge was correct in not instructing the jury as to criminal trespass. This issue is overruled.

Finally, the defendant insists that the Tennessee Habitual Criminal Statute is unconstitutional, citing *Solem v. Helm*, —— U.S. ——, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). We first observe that *Solem* did not hold the South Dakota Habitual Criminal Statute to be repugnant to the Eighth Amendment, as cruel and unusual punishment, as insisted by the defendant. The court went no further than to hold that the South Dakota Habitual Criminal Statute was unconstitutional as applied in that particular case. In the *Solem* case, the United States Supreme Court reaffirmed its holding in *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). In both cases, the defendants had been convicted only of non-violent crimes and both cases recognized that a State is justified in punishing a recidivist more severely than it punishes a first offender.

In reversing *Solem's* conviction, the court emphasized that South Dakota's recidivist statute was more severe than that of any other state. It provided that when the defendant had been previously convicted of any three felonies, in addition to the principal felony, the sentence for the principal felony is enhanced to life imprisonment without possibility of parole. By comparison, the Texas statute, with which the court was concerned in *Rummel*, provided that upon a third conviction of any felony, the defendant's life sentence could be paroled after 12 years.

The Tennessee statute does not define an habitual criminal as one who has

been convicted of any felony as did the Texas and South Dakota statutes. At least two of the three convictions, under the Tennessee statute, are required to be for a crime punishable by death, an infamous crime, or assault to commit murder, mayhem, malicious shooting or stabbing, abduction of a female, or an habitual drug offender. T.C.A. § 39–1–801. Before the defendant can be tried as an habitual criminal under the Tennessee statute, he must be charged with a fourth offense of the commission of one of the specified felonies; not all felonies will trigger the offense. *Evans v. State*, 571 S.W.2d 283 (Tenn.1978); T.C.A. § 39–1–803. Although some of the offenses specified as infamous crimes do not involve violence, the legislature has selected the crimes it obviously deems to be the most serious or those which are more likely to be repeated. The Constitution "is made for people of fundamentally differing views ..." *Rummel, supra,* 445 U.S. at page 282, 100 S.Ct. at page 1143, 63 L.Ed.2d at page 396. *Rummel* recognizes that a state may generally impose harsher or milder penalties for a given crime than its sister states, according to its own notions of severity.

■ Habitual criminals in Tennessee are not confined for life without possibility of parole; they are eligible for parole after serving 30 years. T.C.A. § 40–28–116(b)(1). While the time frame for parole eligibility is longer in Tennessee than in Texas, four convictions are required in Tennessee while only three are required in Texas. Also, as above discussed, three of the four Tennessee convictions must be of a specified character while they need not be in Texas. We do not find that the parole provisions of the Tennessee statute must be the same as that of Texas to meet Eighth Amendment standards; especially with the other distinctions and requirements of the Tennessee statute. We hold that the Tennessee statute does not violate the Eighth Amendment to the United States Constitution.

The defendant has six prior convictions. He was convicted of attempt to commit third degree burglary in 1974, 1975 and in 1979. He was convicted of receiving stolen property in 1976 and of third degree burglary in 1976. In 1979, he was convicted of the unlawful possession of burglary tools. These six convictions, together with the seventh conviction in this case, for a crime committed in 1980, make strong circumstantial evidence that the defendant is a professional burglar. The defendant's record of convictions for seven burglary-type crimes committed in a span of approximately six years, strongly indicate that he is not a proper subject for rehabilitation.

We do not think that convictions under the Tennessee Habitual Criminal Statute will be constitutionally disproportionate in violation of the Eighth Amendment, except perhaps under unusual circumstances which we cannot now anticipate. *Solem* does not adopt or approve a general rule of appellate review of penitentiary sentences. In footnote 16 of the *Solem* case, the Supreme Court stated:

"Contrary to the dissent's suggestions, *post,* at 2, 12, we do not adopt or imply approval of a general rule of appellate review of sentences. Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits. In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate."

For the reasons stated, we do not think that the *Solem* case affects the Tennessee Statute or the previous holdings of the Supreme Court regarding its constitutionality.

All of the issues presented are overruled and the judgment of the trial court is affirmed.

WALKER, P.J., and JAMES C. BEASLEY, Special Judge, concur.